# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

STEVEN W. RUSSELL,                      )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Case No. 15-CV-0087-CVE-PJC
                                        )
PHILLIPS 66 COMPANY,                    )
                                        )
            Defendant.                  )

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 32). Defendant requests summary judgment on plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 12010 et seq. (ADA), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA), as well as plaintiff's state law claim of intentional infliction of emotional distress. Plaintiff responds that he was discriminated against because of his disability and he was retaliated against for taking FMLA leave, and he asks the Court to deny defendant's motion for summary judgment.

## I.

Steven W. Russell was hired by Provesta Corporation, a subsidiary or predecessor company of Phillips 66 Company (Phillips), in 1989. Russell worked as a product development scientist performing quality control testing of food for about two years. Dkt. # 32-1, at 9-10. In the early 1990s, Russell was transferred to a corporate transportation job with Phillips Petroleum Company, and in 2002 he accepted a position as a senior analyst in the new ConocoPhillips organization. Dkt. # 36-2; Dkt. # 32-1, at 13. Russell took FMLA leave in 2009 due to a medical condition, but he returned to work and was not retaliated against for taking FMLA leave. Id. at 25, 126. The corporate transportation department was dissolved in 2010 and Russell was transferred to the finance

department.  Dkt. # 32-1, at 19.  Russell was assigned to work as a marine freight auditor, and in this position Russell was responsible for overseeing payments to third-party vendors, auditing invoices, and working to resolve payment issues.  Id. at 125.

Russell had a difficult time in his new position as a marine freight auditor and his supervisor, Michelle Schaffner, states that Russell's job performance did not meet her minimum expectations. Dkt. # 32-3.  Russell repeatedly made errors such as duplicate payments, failing to follow instructions, improper journal entries, and making coding errors.  Id.  Russell argues that Schaffner failed to provide adequate guidance as he was learning his new job responsibilities.[1]  Dkt. # 36, at 7.  Russell received a rating of below expectations on his 2011 and 2012 performance evaluations. Dkt. # 32-3; Dkt. # 32-4.  Russell wanted to find a job outside of the finance department because he did not feel that he would have an opportunity to advance, and he did not get along with one of his supervisors, Evan Zorn.  Dkt. # 32-1, at 69-83.  Russell had not observed Zorn criticize or discriminate against an employee for taking time off or because an employee was ill and, before September 14, 2012, Russell did not feel that he had been treated unfairly due to an actual or perceived disability.  Id. at 80, 88.

---

[1]     Plaintiff cites an e-mail sent by Schaffner on May 3, 2011 to support this statement, but he quotes statements from the e-mail out of context and it does not support his argument. Plaintiff claims that Schaffner "stayed back" and did not become "more involved" with training him in his new job responsibilities.  Dkt. # 36, at 7.  The e-mail actually states she had been "staying back and letting him ask me questions" because she did not want to micro-manage plaintiff, but she would get more involved if plaintiff were not more proactive in seeking assistance.  Dkt. # 36-7, at 1.  There is also evidence that plaintiff met with Schaffner on August 17, 2012, and plaintiff's summary of the meeting includes an acknowledgment that he would have weekly meeting with Schaffner to help improve his job performance.  Dkt. # 32-3, at 6.

On September 14, 2012, Schaffner noticed that Russell seemed upset or agitated and he was talking very fast, and Russell said that he needed to leave the office to catch his breath.  Dkt. # 32-5, at 3.  Russell testified in his deposition that he "lost it" and had a nervous breakdown, and he was told to go to his wife's office on a different floor.  Dkt. # 32-1, at 87-90.  Russell did not return to work following the incident and was placed on FMLA leave.  Russell visited a physician, Bradley McClure, M.D., and Dr. McClure noted that he was treating Russell following a nervous breakdown. Dkt. # 32-7, at 1.  Russell complained to Dr. McClure that he had been assigned to a new job in December 2010 and that he felt "overwhelmed from day 1."  Id. Russell was clear that he did not want to return to his job in the finance department.  Id.  Russell visited Dr. McClure on December 27, 2012 and Russell reported that he was making test visits back to work but he would not go to his "usual building 'where I worked with those idiots.'"  Id. at 2.  Russell reported that he was anxious about reporting back to work and Russell identified a target date of March 1, 2013 to return to work.  Id.  Russell's FMLA leave had expired on December 12, 2012, but Phillips did not immediately require him to return to work.  See Dkt. # 32-4, at 10.  Dr. McClure saw Russell on February 6, 2013, and Dr. McClure made the following observation:

> He says mood and anxiety wise he was doing well, until he had a significant setback 2-3 weeks ago, says he went back into work to check in there, found out they were holding his job and expected him to return to it (I don't know why he would not have expected this in the first place).  Seems to be exhibiting avoidant traits.  Anticipating retaliation from coworkers before he even returns, says he has to take an anxiety pill before even talking about this because it keys him up so bad.  Says he wants me to give a recommendation to a job in a new dept.  Says that job is not a good match for him.

Dkt. # 36-8, at 6.

Dr. McClure completed an employee health report stating that Russell could return to work but at a different position or in a different department.  Dkt. # 32-8, at 4.  He noted that Russell had

a setback when he visited his workplace and that Russell was unlikely to return to his job in the finance department.  Id.  William C. Parsons, M.D., the chief medical officer for Phillips, received the report and reviewed Russell's medical records, and he found that the report failed to provide enough information for Dr. Parsons to determine what specific functional limitations Russell had that would prevent him from returning to his job in the finance department.  Id. at 1.  Dr. Parsons sent a letter to Russell and asked Russell to work with Dr. McClure to answer the following questions:

> What is the nature, severity, and duration of the impairment as it relates to your current position and/or other positions that may or may not be available?
>
> What specific activity or activities does the impairment limit?
>
> To what extent does the impairment limit your ability to perform the activity or activities listed?

Id. at 7.  On April 2, 2013, Phillips received a letter from Dr. McClure stating that Dr. McClure believed that it would be "therapeutic" for Russell to return to work, but work-related stress played a role in Russell's nervous breakdown and Russell felt overwhelmed by his job "due to the requirement to do moderately complicated math and accounting work." Id. at 6.  Dr. McClure stated that "Russell likely has some degree of cognitive limitation that makes doing moderate level math and accounting work beyond his abilities" and returning to his job in the finance department "would be likely to trigger decomposition."  Id.  Dr. McClure recommended that Russell be permitted to return to work in a new position in a different department.

Dr. Parsons called Dr. McClure to clarify what physical or mental impairments Russell had that prevented him from returning to job as a marine freight auditor, and Dr. McClure explained that Russell had not acquired the "necessary skills through education or experience to successfully

perform the job duties associated with the position that he held in September of 2012." Id. at 2.  Dr. McClure denied that Russell had any type of brain damage or neurological impairment, and he did not recommend additional testing.  Id. at 5.  Dr. Parsons determined that Russell had no medical restrictions that would prevent him from working as a marine freight auditor or from working in the finance department.  Id. at 2.  However, he noted that Russell and Dr. McClure had concluded that Russell lacked the requisite skills to perform the math and accounting functions of the position of marine freight auditor.  Id.

On May 13, 2013, Nikki Dickson, a human resources business partner for Phillips, sent Russell a letter advising Russell that he had been released to return to work without any medical restrictions and she stated that Russell had "indicated on more than one occasion that [he did] not intend or desire to return to [his] current position."  Dkt. # 32-4, at 11.  Dickson advised Russell that Phillips was filling his position due to business needs and it had posted a job opening for Russell's former position of marine freight auditor.  Id.  Phillips reviewed the vacant positions in the finance department to determine if there were any open jobs that did not require moderate level math or accounting skills, but there were no open positions that met this qualification.  Id.  Dickson advised Russell that he had seven weeks of unused vacation time, and he would be given seven weeks to apply for any vacant positions at Phillips that he believed were better suited for him, but if he did not obtain a new position in seven weeks his employment would be terminated.  Id.  Russell had been receiving short term disability benefits while he was on leave, and Dickson informed Russell that those payments would cease due to fact that plaintiff had been capable of returning to his job as a marine freight auditor since at least April 11, 2013.  Id.  Phillips provided Russell a laptop computer and the necessary information for him to access job postings, and he was permitted to

apply for any open position within the company.  Dkt. # 32-2, at 9.  Russell had not found a new

position by August 2, 2013 and Phillips gave him 30 more days to continue to look for a new job

before his employment would officially be terminated.  Id. at 12.  Russell applied for at least five

open positions, but he was not accepted for any of the jobs and he could not find a new position

within Phillips.  Dkt. # 32-9 at 1; Dkt. # 32-10, at 1; Dkt. # 32-11, at 1.  The persons responsible for

making the hiring decisions determined that plaintiff either lacked the necessary qualifications or

that another applicant was better qualified.  Id.  Phillips terminated Russell's employment on

September 13, 2013.

On February 21, 2014, Russell filed a general intake questionnaire with the Equal

Employment Opportunity Commission, and he alleged that he was discriminated against on the basis

of a disability.  Dkt. # 32-1, at 108-114.  He claimed that he did not currently have a disability, but

he was previously disabled due to a major depressive disorder.  Id. at 110.  He subsequently filed

a charge of discrimination and received a notice of right to sue, and he filed this case on February

19, 2015.  Russell alleged a claim of discrimination under the ADA, claims of retaliation under the

ADA and FMLA, and a state law claim of intentional infliction of emotional distress.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Defendant seeks summary judgment on each of plaintiff's claims, because plaintiff's employment was terminated after he refused to return to his job as a marine freight auditor and he was unable to find other employment with Phillips.  Plaintiff argues that he suffered from depression and anxiety, and that there is a genuine dispute as to whether he was terminated because of a disability or in retaliation for protected conduct under the ADA or FMLA.

**A.**

Defendant argues that plaintiff cannot establish a <u>prima</u> <u>facie</u> case of disability discrimination, because plaintiff did not have a disability as that term is defined in the ADA and, even if he did, he was not qualified by his own admission to perform the essential functions of a marine freight auditor. Dkt. # 32, at 14-23. Plaintiff responds that he had the conditions of major depressive disorder and panic disorder and these conditions are considered disabilities under the ADA, and defendant failed to accommodate plaintiff's disability by granting his request for a transfer outside of the finance department. Dkt. # 36, at 23-31.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination can be shown by direct or circumstantial evidence. <u>See</u> <u>Reinhardt v. Albuquerque Public Schools Bd. of Educ.</u>, 595 F.3d 1126, 1131 (10th Cir. 2010). ADA discrimination cases based on circumstantial evidence are governed by the burden-shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997). Pursuant to this framework, the plaintiff bears the initial burden of establishing a <u>prima</u> <u>facie</u> case of discrimination. If he does so, "then the defendant must offer a legitimate, non-[discriminatory] reason for the employment action. The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." <u>Metzler v. Fed. Home Loan Bank of Topeka</u>, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations omitted). In order to defeat a motion for summary judgment, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the

8

challenged action is pretextual-i.e., unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 451

(10th Cir. 1995).

Because there is no direct evidence of discrimination, the Court will apply the

McDonnell/Douglas burden shifting analysis.   In order to establish a prima facie case of

discrimination under the ADA, a plaintiff must demonstrate:

> (1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is
> qualified, that is, [he] is able to perform the essential functions of the job, with or
> without reasonable accommodation; and (3) that the employer terminated [his]
> employment under circumstances which give rise to an inference that the termination
> was based on [his] disability.

Morgan, 108 F.3d at 1324 (internal citations omitted).   The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life
> activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).  Impairments that are "transitory and minor" may not be used to support a

claim of disability discrimination, and an impairment is transitory if it has an actual or expected

duration of less than six months.   42 U.S.C. § 12103(3)(B).   The determination of whether a

condition is transitory and minor must be made using an objective standard. 29 C.F.R. § 1630.15(f).

The mere fact that an employee applies for and receives FMLA leave does not show that the

employer regarded an employee as disabled.  Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1219

(10th Cir. 2007).  In the Tenth Circuit, an ADA plaintiff has the burden to show "(1) he has an

impairment that (2) substantially limits (3) a major life activity."  Smothers v. Solvay Chemicals,

Inc., 740 F.3d 530, 545 (10th Cir. 2014).  The first and third requirements are matters of law for the

Court to decide, but the second requirement is a question of fact that must be submitted to a jury if

9

there is a genuine dispute.  Id.; Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

Under the ADA, it is plaintiff's burden to establish that he has an actual or perceived disability.  Steele v. Thiokol Corp., 241 F.3d 1248, 1253 (10th Cir. 2001).  A person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  Depression, anxiety, and ADHD are not per se disabilities, and merely stating that he/she has received a diagnosis of one of these conditions does not establish that a plaintiff is disabled under the ADA.  Johnson v. Sedgwick County Sheriff's Dep't, 461 Fed. App'x 756, 759 (10th Cir. Feb. 14, 2012);[2] Evans v. Century Link Corp., 2013 WL 1284874 (D. Utah. Mar. 8, 2013).  To constitute a disability, a plaintiff's depression must substantially limit the plaintiff's performance of a major life activity and it is the plaintiff's burden to produce evidence raising a genuine dispute on this issue.  Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 495-96 (10th Cir. 2000).  The ADA was amended in 2011, and regulations implementing the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (ADAAA), provide that:

(1) In general.  Major life activities include, but are not limited to:

(i) caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions.

---

[2]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

29 C.F.R. § 1630.2(i).  The ADAAA was intended "to correct what [Congress] viewed as an overly restrictive interpretation of the [ADA's] terms that had been adopted by the Supreme Court . . . ." Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1144 (10th Cir. 2011).  The ADAAA was intended to broaden the scope of individuals that may qualify as disabled, but the ADAAA does not relieve a plaintiff of his burden to come forward with evidence that any limitations of a major life activity are caused by a mental or physical impairment.  Felkins v. City of Lakewood, 774 F.3d 647, 652-53 (10th Cir. 2014).

The Court will initially consider whether plaintiff qualifies as disabled under the ADA. Plaintiff claims that he has been diagnosed with major depressive disorder and panic disorder, and these conditions impair his ability to sleep, breathe, concentrate, and work.  The medical evidence does support plaintiff's claim that he has been diagnosed with depression and this is a recognized mental impairment.  Dkt. # 36-8 (Dr. McClure's treatment records showing that he diagnosed plaintiff with major depressive disorder).  However, this does not automatically mean that plaintiff is disabled within the meaning of the ADA, because plaintiff still has the burden to show that his depression limits his performance of a major life activity.  Plaintiff's arguments on this issue are very general, and several times he states that he is "alleging" that depression interferes with his ability to sleep, breathe, concentrate, and work.  He has not made any attempt to link these allegations to the evidence in the summary judgment record, and the medical evidence does not support his allegations.  As to the major life activity of sleeping, plaintiff reported some difficulty sleeping in October 2012 and he reported occasional insomnia in February 2013, but plaintiff reported that he was sleeping well when he was taking Ambien.  Id. at 1, 6.  Plaintiff's treatment records for the following months do not contain any complaints concerning lack of sleep, and there

11

is no basis to find that plaintiff was substantially limited in his ability to sleep.  Dr. McClure noted that plaintiff had no history of pulmonary problems and plaintiff subjectively reported that he had no difficulty breathing, and there is no evidence that plaintiff's ability to breathe was limited in any way by his depression.  Dkt. # 36-8, at 6, 8, 10, 14   There is also no evidence that depression limited plaintiff's ability to think.  On February 6, 2013, Dr. McClure found that plaintiff seemed depressed but his thought process was "coherent" and plaintiff was "appropriately conversant" and he made similar findings on July 23, 2013.  Id. at 6, 13.  He subsequently described plaintiff as "awake" and "alert."  Id. at 14, 16, 20.  While plaintiff's treatment records show that he fixated on alleged discriminatory treatment, there is no medical evidence that his ability to think was in any way impaired due to symptoms of depression.  Working is a major life activity, but courts should consider the "major life activity of 'working' . . . only as a last resort."  Carter, 662 F.3d at 1146.  A person is substantially limited in his ability to work only he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  EEOC v. Heartway Corp., 466 F.3d 1156, 1162 (10th Cir. 2006).  The evidence shows that plaintiff's job as a marine freight auditor caused him stress and may have contributed to his nervous breakdown, but Dr. McClure determined that it would be "therapeutic" for plaintiff to return to work as long he did not have to engage in moderately complex math or accounting.  The restriction noted by Dr. McClure is not actually a medical restriction related to plaintiff's disability, but it is a limitation in plaintiff's own background or training that makes certain types of work frustrating or difficult.  This restriction also leaves open a wide range of jobs and it is clear that Dr. McClure believed that plaintiff could and should return to work.  There is no evidence that plaintiff was restricted from performing a wide range of jobs and

he was not limited in the major life activity of working.  The Court finds that plaintiff has failed to show that he was substantially limited in the ability to perform any major life activity due to his depression.

Plaintiff argues that he could be disabled under a theory that defendant perceived him to be disabled.  In the Tenth Circuit, a person is regarded as disabled when "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Johnson v. Weld County, Colorado, 594 F.3d 1202, 1219 (10th Cir. 2010).  The mere fact that an employee applies for and receives FMLA leave does not show that the employer regarded an employee as disabled.  Berry, 490 F.3d at 1219.  Plaintiff's entire argument on this issue is that Dr. McClure "expressed his belief that as part of Plaintiff's disability [that] he had cognitive limitation," and he could be arguing that defendant regarded plaintiff as unable to perform the functions of his job as a marine freight auditor due to the perceived cognitive limitation.  Dkt. # 36, at 23-23.  This argument is unsuccessful for two reasons.  First, defendant was well aware before plaintiff had a nervous breakdown on September 14, 2012 that he may have lacked the necessary skills to perform his job, because his supervisor, Schaffner, found that plaintiff was not meeting her minimum expectations for the job.  This shows that defendant's perception of any cognitive limitations relevant to performing his duties as a marine freight auditor was unrelated to his depression.  Second, plaintiff misrepresents Dr. McClure's findings, because Dr. McClure never linked plaintiff's inability to work as a marine freight auditor with his depression.  Instead, Dr. McClure found that plaintiff suffered from work-related stress because plaintiff felt "overwhelmed . . . due to the requirement to do moderately

complicated math and accounting work . . . ."  Dkt. # 32-8, at 6.  The evidence also shows that plaintiff was aware that defendant expected him to return to his job after his nervous breakdown, and this shows that defendant would have allowed him to return to work regardless of any perceived cognitive limitation.  Dkt. # 36-8, at 6.  The Court finds that defendant did not regard plaintiff as disabled due to a perceived cognitive limitation.[3]

Even if plaintiff could establish a prima facie case of disability discrimination, defendant states that it had a legitimate, non-discriminatory reason for terminating plaintiff's employment. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992).  The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007).   Defendant states that plaintiff refused to return to his position as a marine freight auditor and he could not find another open position within the company, and defendant terminated his employment after being off work for almost a full year.  Dkt. # 32, at 23. Defendant has met its burden to state a legitimate, non-discriminatory reason for terminating plaintiff's employment.

---

[3]      The Court has found that plaintiff did not have an actual or perceived disability under the ADA and it is unnecessary for the Court to consider defendant's argument that plaintiff was not a "qualified person with a disability" due to plaintiff's inability to perform the essential functions of a marine freight auditor.  See Dkt. # 32, at 16-18.

14

At this stage of the proceeding, the burden shifts to plaintiff to show that defendant's explanation for terminating plaintiff's employment is pretextual. Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004).  "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  A plaintiff typically attempts to satisfy his or her burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan, 108 F.3d at 1323).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff argues that defendant willfully mischaracterized the nature of plaintiff's condition and it refused to accommodate him by finding another job for him, even though he had worked for defendant for over 24 years. Dkt. # 36, at 31-32. He claims that defendant repeatedly denied having any knowledge of his "medical restriction" and the "only rational explanation for terminating [p]laintiff's employment is because he exercised his rights under the ADA and requested an accommodation." Id. at 32. Defendant has established that it had a legitimate business reason for terminating plaintiff's employment.  Plaintiff refused to return to his position as a marine freight auditor and defendant had legitimate reasons for needing to fill his position.  Defendant allowed plaintiff to look for another job within the company and it gave him additional time when he could

15

not find a new position after seven weeks.  Plaintiff has produced no evidence suggesting that the persons who were filling the new positions for which he applied were even aware that he claimed to have a disability, and defendant has offered legitimate reasons to explain why plaintiff was not hired for a new position.  Plaintiff's arguments could be characterized as a challenge to defendant's business judgment for failing to find a position for an employee who had been with the company for 24 years, but the role of the Court is to remedy intentional and unlawful discrimination, not to question the business judgment of an employer.  See Young v. Dillon Companies, 468 F.3d 1243, 1250 (10th Cir. 2006).  Even if plaintiff could establish a prima facie case of disability discrimination, the Court would find that he could not show that defendant's legitimate, non-discriminatory reason for terminating is pretextual.

## B.

Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim under the ADA, because plaintiff did not engage in any protected activity before the decision was made to terminate his employment and, even if he did, there is no evidence that defendant's reason for terminating his employment was pretextual.  Dkt. # 25-26.  Plaintiff responds that he repeatedly requested an accommodation and defendant failed to assist him with finding a new position, and this is sufficient to establish a genuine dispute as to a material fact on his retaliation claim.

To establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." EEOC v. Picture People, Inc., 684 F.3d 981, 988 (10th Cir. 2012).  If the plaintiff establishes a prima facie case of retaliation, the

16

burden shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the adverse employment action. Id. If the defendant states a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to show that the defendant's non-discriminatory is pretextual. Id.

The Court preliminarily notes that it has determined that plaintiff was not actually disabled and that defendant did not perceive plaintiff as disabled. A plaintiff may proceed with an ADA retaliation claim, even if not disabled under the ADA, if the plaintiff has a reasonable good faith belief that he had a disability. Selenke v. Medical Imaging of Colorado, 248 F.3d 1249, 1265 (10th Cir. 2001). Defendants have not raised any argument concerning plaintiff's good faith belief that he had a disability, and for the purpose of this Opinion and Order the Court will assume that plaintiff can proceed with a retaliation claim due to his belief that he was disabled due to depression. The Tenth Circuit has held that requesting reassignment can be considered protected activity for the purpose of a retaliation claim. Jones v. UPS, Inc., 502 F.3d 1176, 1194 (10th Cir. 2007). In this case, plaintiff effectively requested reassignment to a new job by claiming that he could not return to his job as a marine freight auditor due to depression and anxiety, and the Court finds that this is sufficient to show that plaintiff engaged in protected activity. Plaintiff's employment was terminated in September 2013 and this was an adverse employment action. Plaintiff can establish the first and second elements of a prima facie case of retaliation under the ADA.

The parties dispute whether plaintiff can show any causal link between his protected activity and his termination. To establish a causal connection between these events, some courts have required a plaintiff to show that his protected activity was the "but-for" cause of his termination, but this standard has not been adopted by the Tenth Circuit. See Nyanjom v. Hawker Beechcraft Corp., 2015 WL 2015 WL 2297934, *20 (D. Kan. May 26, 2015); Purcell v. American Legion, 44 F. Supp.

3d 1051, 1057 (E.D. Wash. 2014); <u>Bennett v. Dallas Independent Sch. Dist.</u>, 936 F. Supp. 2d 767, 783 (N.D. Tex. 2013).   Evidence of temporal proximity between the protected activity and the adverse employment action is generally insufficient, standing alone, to establish causation for a retaliation claim.  <u>Hennagir v. Utah Dep't of Corrections</u>, 587 F.3d 1255, 1266-67 (10th Cir. 2009). Plaintiff's argument as to causation appears to be simply that defendant informed him that he would be terminated if he could not obtain a transfer to a vacant position and he suggests that defendant was obligated to transfer him to a new position due to his alleged disability.  Dkt. # 36, at 32-33. However, the mere fact that plaintiff was not successful in his efforts to obtain a new position with defendant after he refused to return to his position as a marine freight auditor does not establish causation.  Plaintiff applied for positions in different departments with different supervisors, and there is no evidence that the decision makers responsible for filling those positions even knew that plaintiff had taken FMLA leave or claimed to have disability.  Dkt. # 32-9; Dkt. # 32-10; Dkt. # 32-11.  Plaintiff was either unqualified for the positions for which he applied or less experienced than other applicants.  <u>Id.</u>  The Court also notes that there is no close temporal proximity between plaintiff's termination and his notice to defendant that he would not be returning to his job as a marine freight auditor.  Defendant learned as early as February 2013 that Dr. McClure believed that plaintiff had "cognitive limitations" that made moderate level math and accounting stressful for plaintiff and that Dr. McClure was recommending that plaintiff be assigned to a new job.  Dr. Parsons attempted to gather more information and confirmed in April 2014 that plaintiff would not return to his job and that he was requesting reassignment.  Plaintiff's employment was terminated in September 2013 and there is no close temporal proximity between plaintiff's termination and his notice that he would be seeking reassignment.  The lack of causation is bolstered by the undisputed

18

fact that defendant did not believe that plaintiff had any medical restrictions and that defendant did not perceive plaintiff as disabled, but defendant did not immediately terminate plaintiff's employment and allowed him to look for another job within the company.  The Court finds no causal connection between plaintiff's request for reassignment and his termination, and he not established a prima facie case of retaliation under the ADA.

### C.

Defendant argues that there is no causal connection between plaintiff's FMLA leave and his termination, and defendant seeks summary judgment on plaintiff's FMLA retaliation claim.  Plaintiff argues that defendant was unwilling to assist him with finding a new position within the company and this shows that his employment was terminated to retaliate against him for taking FMLA leave.

The FMLA prohibits an employer from retaliating against an employee for opposing  a practice made unlawful by the FMLA.  29 U.S.C. § 2615(a)(2).  FMLA retaliation claims are subject to the burden-shifting framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007).  To make out a prima facie FMLA retaliation claim, a plaintiff must show that "(1) [he] engaged in a protected activity; (2) [his employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006).  The Tenth Circuit characterizes "the showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the employer." Campbell, 478 F.3d at 1287 (quoting Metzler, 464 F.3d at 1171).  If plaintiff can establish a prima facie case of FMLA retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for

19

the adverse employment action.  Id. at 1290.  The burden shifts back to the plaintiff to "show that there is a genuine dispute of material fact as to whether [the employer's] reasons for terminating [him] are pretextual."  Id. (quoting Metzler, 464 F.3d at 1172).  To establish a genuine dispute of material fact as to pretext, a plaintiff cannot rely solely on temporal proximity of his FMLA leave and the adverse employment action, and the plaintiff must offer some other evidence of retaliatory motive.  Metzler, 464 F.3d at 1172.

There is no dispute that plaintiff engaged in protected activity by taking FMLA leave and that he suffered an adverse employment action, but the parties do dispute whether there was a causal connection between plaintiff's FMLA leave and his termination.  Plaintiff argues that defendant did not take his medical restrictions seriously and defendant provided little or no assistance with plaintiff's search for a new position, and he claims that this is evidence of a causal connection between his FMLA leave and his termination.  Dkt. # 36, at 33.  Plaintiff's FMLA leave expired on December 12, 2012 and his employment was terminated on September 13, 2013, and there is not a close temporal connection between the two events.  The evidence shows that plaintiff did not have any medical restrictions that prevented him working and he told Dr. McClure that knew that defendant was expecting him to return to work after he was cleared to return to work.  Dkt. # 36-8, at 6.  Plaintiff decided that it would be too stressful to return to his position as a marine freight auditor and he requested that Dr. McClure recommend that he be transferred to a different job.  Id. When this recommendation was conveyed to Dr. Parsons, he made further inquiries and Dr. McClure could not identify any specific mental or physical limitations that prevented plaintiff from working,  but defendant advised plaintiff that it understood that plaintiff did not intend to resume his job as a marine freight auditor.  Plaintiff did not make any attempt to retain his position and he

began looking for a different position within the company.  After five months, plaintiff was unsuccessful in finding a new job and his employment was terminated.  Nothing about these facts suggests that defendant was retaliating against plaintiff for taking FMLA leave and plaintiff has not shown that he was treated differently than any other employee looking for a new position with defendant.  There is no evidence of a causal connection between plaintiff's FMLA leave and his termination, and defendant should be granted summary judgment on plaintiff's FMLA retaliation claim.

### D.

Defendant argues that it is entitled to summary judgment on plaintiff's intentional infliction of emotional distress claim, because there is no evidence that defendant engaged in extreme and outrageous conduct.  Plaintiff claims that defendant knew that he was suffering from depression and refused to offer him an accommodation, and he states that defendant "strung [him] along for months making him think there was a chance he could transfer" when defendant did not intend to reassign him to a new job.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim,

'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff.  See Computer Publications, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct);

Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

The Court does not find that defendant engaged in extreme and outrageous conduct. Plaintiff mischaracterizes the events leading up to his termination and there is no evidence supporting his allegation that defendant "strung him along." Plaintiff applied for several jobs for which he was not qualified or the most experienced applicant, and he has not shown that the persons making the hiring decisions had any knowledge that plaintiff claimed to be disabled. Defendant did not immediately terminate plaintiff after he had exhausted his FMLA leave and it became clear that plaintiff would not be resuming his position as a marine freight auditor. Instead, defendant allowed plaintiff to use his accrued vacation time to look for a new position, and defendant gave plaintiff more time when he was initially unsuccessful. Plaintiff has not shown that defendant made any misleading statements about plaintiff's prospects of finding a new job and, while he may have suffered from emotional distress, it was not caused by defendant. Defendant is entitled to summary judgment on plaintiff's intentional infliction of distress, and defendant's motion for summary judgment should be granted in its entirety.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and

Brief in Support (Dkt. # 32) is **granted**.  A separate judgment is entered herewith.

**DATED** this 25th day of April, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE